COURT OF APPEALS
DECISION
DATED AND FILED

March 31, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.     **2021AP982-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2018CF446

IN COURT OF APPEALS
DISTRICT IV

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

V.

DARRICK R. THOMPSON,

   DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Dane County: JOHN D. HYLAND, Judge. *Affirmed*.

Before Kloppenburg, Graham, and Nashold, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Darrick Thompson appeals a judgment of conviction for attempted first-degree intentional homicide and first-degree recklessly endangering safety, both as party to a crime, and an order that denied his postconviction motion for a new trial. He argues, among other things, that his trial counsel was ineffective for: (1) failing to conduct a cross-examination of one of Thompson's co-defendants who entered a plea agreement with the State; and (2) failing to retain, consult with, and present the testimony of a forensic footwear impression expert to counter evidence presented by one of the State's witnesses. For reasons explained below, we disagree and affirm.

## BACKGROUND

¶2 This case arises out of a shooting that occurred near Braxton Place in downtown Madison on February 6, 2018. According to reports of the incident, the shooter approached a parked Crown Victoria on foot just before midnight and discharged a firearm toward the vehicle, injuring one of its occupants.

¶3 Based on video surveillance footage, law enforcement determined that a Ford Taurus had followed the red Crown Victoria to its parking spot on the night of the shooting, and further, that the Taurus was associated with a man named Roberto Sostre. Through additional investigation, law enforcement came to believe that Thompson, Sostre, and two other men, Jawaun Greer and Xavier Davis, were the occupants of the Taurus that night. In this opinion, we sometimes refer collectively to Sostre, Greer, and Davis as Thompson's co-defendants.

### The Charges and Trial

¶4 The State charged Thompson with one count of attempted first-degree intentional homicide and one count of first-degree recklessly endangering

2

safety, use of a dangerous weapon, and the State filed similar charges against Thompson's three co-defendants.[1] Although the State charged Thompson and his co-defendants as party to a crime under WIS. STAT. § 939.05 (2019-20),[2] the State's leading theory was that Thompson was the shooter.

¶5 The co-defendants' trials were severed, and Thompson's trial took place over five days. We focus our discussion on the testimony of Officer Thomas Parr and Thompson's co-defendants.

¶6 Officer Parr is a crime scene investigator who investigated the scene of the shooting. He testified that it was snowing heavily that night, and he provided testimony about a "footprint impression" that officers found in the snow and linked to the shooter. Parr had produced a pretrial report about his measurement of the impression and his estimate of the shooter's shoe size, and at trial, Parr testified consistently with the statements in his pretrial report. Trial counsel objected to Parr's testimony about the shooter's shoe size, and he aggressively cross-examined Parr about his observations of the crime scene and the overall reliability of his conclusions. We discuss Parr's testimony at length in the discussion section below.

---

[1] All three co-defendants were charged with attempted first-degree intentional homicide as party to a crime, and Greer and Davis were also charged with first-degree recklessly endangering safety as party to a crime.

[2] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted. A defendant may be found guilty as party to a crime if the person directly committed the crime, aided or abetted the person who directly committed the crime, or was a member of a conspiracy to commit the crime. WIS. STAT. § 939.05. To convict, all jurors must be persuaded that the defendant is liable under one of these theories, but jurors are not required to unanimously agree on the theory of liability. *See Holland v. State*, 91 Wis. 2d 134, 143, 280 N.W.2d 288 (1979).

¶7     All three co-defendants testified at trial pursuant to some arrangement with or compulsion from the State.   During the trial, Davis unexpectedly entered into a plea agreement with the State pursuant to which he agreed to testify against Thompson.   The State compelled Sostre and Greer to testify through a grant of use immunity.[3]

¶8     Davis was the first of the three co-defendants to testify.   During direct examination, the State asked Davis about his status as a co-defendant and the plea that he had entered earlier that day:

> [The Prosecutor:]  Mr. Davis, were you a co-defendant in this case?
>
> [Davis:]  Yes, I was.
>
> [The Prosecutor:]  Did you enter a plea earlier today?
>
> [Davis:]  Yes, I did.

The State then asked Davis about his prior convictions, and Davis testified that he had been convicted of eleven crimes.

¶9     Davis testified about the events of February 6, 2018, as follows.  He, Thompson, Sostre, and Greer gathered at Greer's house that night.  Davis did not see any guns present.  The group left Greer's house in the Taurus, with Davis driving.  Davis did not remember if Thompson ever drove the Taurus that evening. The group encountered a red car in Fitchburg, but Davis did not recall the make,

---

[3] Once a witness is compelled to give an incriminating testimonial statement, that witness is entitled to a grant of immunity coextensive with the Fifth Amendment privilege against self-incrimination.  *See* ***Kastigar v. United States***, 406 U.S. 441, 446, 449 (1972).  Such immunity is commonly referred to as "use immunity." ***State ex rel. Douglas v. Hayes***, 2015 WI App 87, ¶11, 365 Wis. 2d 497, 872 N.W.2d 152.  Additionally, "derivative use immunity" prohibits the use of any evidence subsequently discovered by authorities through direct or indirect use of the compelled statement. ***Id.***

model, or any details about that car. The next time Davis saw the red car, it was parked on West Washington Avenue. Davis made a U-turn and Thompson exited the Taurus. Davis then pulled into a parking lot at Braxton Place, where "Thompson reconnect[ed] with the car for a moment." Upon moving the Taurus into another parking lot, Davis exited the Taurus, and, "at some point," he heard gunfire. Davis saw Thompson approach the Taurus, Davis and Thompson got in, and Davis drove off. Davis did not hear Thompson say anything after they returned to the Taurus.

¶10 Trial counsel was offered the opportunity to cross-examine Davis, but counsel did not ask Davis any questions.

¶11 Sostre testified as follows. He, Thompson, Davis, and Greer were all members of the same gang. They met at Greer's house the night of February 6, and Sostre "observed guns getting put away." They left Greer's house in a Taurus that belonged to Sostre's girlfriend. At some point that night, they drove past a red car with tinted windows. Davis was driving, and someone in the Taurus said that the red car "might be the ops," meaning a rival gang. Upon making a turn and spotting the red car again, Sostre knew something was going to happen because "guns got to being cocked." Sostre said, "It's not going to happen, not in my car," and he then felt a pistol going into his side, which he interpreted as a threat. Thompson got out of the Taurus, Davis parked, and Sostre heard gunshots. Davis moved the Taurus to another lot and also exited the Taurus, and then Thompson and Davis returned. Sostre saw a black gun in Thompson's possession, and Thompson said that the gun had jammed. After they drove off, Sostre told Thompson, "It could have been kids in there. It could have been anybody in there. You don't know who you shot." Thompson responded that he did not care

because it was "the opposition's car." Sostre also testified that he had previously been convicted of eleven crimes.

¶12 On cross-examination, trial counsel questioned Sostre about the circumstances in which he gave a statement to the police. Counsel also pointed out contradictions between Sostre's statement to the police and his trial testimony. For example, Sostre originally told the police that Thompson, rather than Davis, had been the driver that night. Counsel read various statements that Sostre made to police in an attempt to minimize his own role in the shooting, and Sostre acknowledged that he was trying to convince the police that he was an "innocent bystander" who was "forced to be present at gunpoint." Counsel was able to show that Sostre had just been released after serving ten years in prison, and that he had to care for his son and his dying father. Counsel got Sostre to admit that, although the charges against him had been dismissed, Sostre was "very worried" that the State could refile the charges. Counsel also cross-examined Sostre about statements that he allegedly made to three other individuals, in which Sostre allegedly told those individuals that he had been the shooter.

¶13 Prior to trial, Greer had been interviewed by Madison police officers on two occasions. When the State called Greer as a witness at Thompson's trial, he was initially uncooperative, claiming that he did not remember anything about the events of February 6 or any interviews he had with the police. After Greer provided testimony that was inconsistent with his prior statements to the police,

the circuit court designated Greer as a hostile witness, and the State played portions of Greer's two recorded interviews.[4]

¶14     We set forth some of the more pertinent statements Greer provided in clips that were played to the jury.  In his first interview, Greer initially refused to provide any information to the police.  However, after speaking with his father, Greer broke down.  He acknowledged that he had been present at the time of the shooting, but refused to provide the names of any other individual who was involved.  Greer stated that he and three others were driving around that evening and, at some point, they began to follow another car that looked like a police cruiser but was "red, maroon, purple, or black."  The guy who ended up being the shooter said "that's that girl's car," and something about the license plates.  When they were downtown, the shooter said "I'm fixing to get out right here, I'm fixing to do something."  The shooter got out, walked around, came back, and said, "Hold on, I'm fixing to come right back.  Go back to the parking lot where you just got me."  The shooter walked off and "it was just hella gunshots."  The driver said, "I ain't leaving him" and also got out of the car.  The guy who owned the car hopped into the driver seat and Greer hopped in the passenger seat as if they were going to drive away, and then "everybody ran back to the car."  Greer saw a gun "at the end," "after the shooting," and the shooter said that "the gun broke."  The transcripts of the interviews reveal that Greer eventually identified the occupants

---

[4] WISCONSIN STAT. § 972.09, pertaining to criminal actions, provides that, "[w]here testimony of a witness … is inconsistent with a statement previously made by the witness, the witness may be regarded as a hostile witness and examined as an adverse witness, and the party producing the witness may impeach the witness by evidence of such prior contradictory statement."

of the Taurus as himself, Thompson, Davis, and Sostre, and he identified Thompson as the shooter.[5]

¶15 On cross-examination, Thompson's counsel questioned Greer about potential inconsistencies between his two interviews about where Thompson had been seated in the Taurus and whether someone other than Thompson had been the shooter. Counsel also asked Greer about an alleged conversation with another inmate in his cellblock, who later testified that Greer tried to get him to pass the message to Thompson that "I'm sorry about lying on you in this case." Greer denied trying to pass that message. Finally, counsel got Greer to admit that he had his "own trial coming up" and was being prosecuted "by these very same [prosecutors]," that Greer "would like to look good in their eyes," that Greer's case was in front of the same judge who was presiding over Thompson's trial, and that Greer "would like to look good to Judge Hyland for bail purposes, motion purposes," and, if he were convicted, "for sentencing purposes."

¶16 The State presented a number of additional witnesses, including law enforcement officers who investigated the shooting and several witnesses who were near Braxton Place when the shooting took place. It presented surveillance footage of a man who might have been the shooter running by an apartment building. And it presented Facebook messages indicating that someone posting from Thompson's account was in the company of Davis, Sostre, and a third individual 45 minutes prior to the shooting, and then out of communication at the time the shooting took place. The defense presented the testimony of one of

---

[5] It is difficult to discern from the trial transcript which portions of the second interview were played to the jury, but the circuit court found that Greer identified Thompson as the shooter, and neither party disputes that finding on appeal.

Thompson's friends, who testified that Sostre told her that Sostre was the shooter, and of the inmate at the jail who testified that Greer attempted to apologize to Thompson for lying about the case.

¶17 During closing arguments, the prosecutor referred to Parr's trial testimony, as well as the testimony provided by the co-defendants. Thompson's trial counsel argued that each of the co-defendants had presented self-serving testimony against Thompson to further their own self-interest, and that Sostre was the likely shooter. The jury convicted Thompson of both counts.

## Postconviction Proceedings

¶18 Thompson moved for postconviction relief, arguing that he was entitled to a new trial because he received ineffective assistance of counsel. He argued, among other things, that counsel was ineffective for not cross-examining Davis about the benefits of his plea agreement with the State and for failing to retain a defense expert who could counter Parr's testimony about the "footwear impression" he linked to the shooter. He also argued that the testimony of his new defense expert constituted newly discovered evidence warranting a new trial and that he was also entitled to a new trial in the interest of justice.

¶19 The circuit court held a *Machner* hearing.[6] At the hearing, Thompson presented the testimony of trial counsel, who testified about his performance at trial and his defense strategy. Thompson also presented the

---

[6] *See State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979). A *Machner* hearing is "[t]he evidentiary hearing to evaluate counsel's effectiveness, which includes counsel's testimony to explain his or her handling of the case." *State v. Balliette*, 2011 WI 79, ¶31, 336 Wis. 2d 358, 805 N.W.2d. 334.

testimony of William Bodziak, a forensic footwear expert who was retained by Thompson's appellate counsel and disputed the reliability of Parr's footprint measurement and his estimate of the shooter's shoe size. We expand on trial counsel's testimony and Bodziak's testimony as needed in the discussion section below.

¶20    After additional briefing, the circuit court issued a written decision denying Thompson's postconviction motion. The court rejected Thompson's claim that counsel was ineffective by failing to cross-examine Davis about his plea agreement with the State. It found that counsel made a strategic choice not to cross-examine Davis, and that counsel's failure to cross-examine Davis did not prejudice Thompson's defense. The court also determined that trial counsel's failure to retain a footprint expert was not deficient or prejudicial. Finally, the court rejected Thompson's claims of newly discovered evidence and that Thompson was entitled to a new trial in the interest of justice. Thompson appeals.

## DISCUSSION

¶21    On appeal, Thompson maintains that trial counsel provided ineffective assistance by failing to cross-examine Davis to reveal the details of his plea agreement and by failing to retain, consult with, and present the testimony of a forensic footwear impression expert to attack Parr's opinions and credibility. He also argues in the alternative that Bodziak's expert opinion is newly discovered evidence, and that he is entitled to a new trial in the interest of justice. We address these arguments in turn.

## I. Ineffective Assistance of Counsel

¶22     A criminal defendant is guaranteed the right to the assistance of counsel by the Wisconsin Constitution, *see* WIS. CONST. art. I, § 7, and the United States Constitution, *see* U.S. CONST. amend. VI. *State v. Klessig*, 211 Wis. 2d 194, 201-02, 564 N.W.2d 716 (1997). "'[T]he right to counsel is the right to the *effective* assistance of counsel.'" *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (emphasis added) (quoted source omitted). To prevail on a claim of ineffective assistance of counsel, a defendant has the burden to prove that trial counsel's performance was deficient, and also, that the deficiency prejudiced the defendant. *Id.* at 687.

¶23     When evaluating whether trial counsel's performance was deficient, we "apply[] a heavy measure of deference to counsel's judgments," *id.* at 690-91, making "every effort" to "evaluate the [representation] from counsel's perspective at the time" and to "eliminate the distorting effects of hindsight," *id.* at 689. Counsel enjoys a "strong presumption" that his conduct "falls within the wide range of reasonable professional assistance," *id.*, and counsel's performance need not be perfect, nor even very good, to be constitutionally adequate, *State v. Thiel*, 2003 WI 111, ¶19, 264 Wis. 2d 571, 665 N.W.2d 305. To demonstrate deficient performance, the defendant must show that his counsel's representation "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. That is, a defendant must show specific acts or omissions of counsel that were "outside the wide range of professionally competent assistance." *Id.* at 690.

¶24     When evaluating whether trial counsel's performance prejudiced the defendant, we consider whether there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

different." *Id.* at 694. Such a probability "exists when there is 'a "substantial," not just "conceivable," likelihood of a different result.'" *State v. Cooper*, 2019 WI 73, ¶29, 387 Wis. 2d 439, 929 N.W.2d 192 (quoted source omitted).

¶25 "Whether counsel's actions constitute ineffective assistance presents a mixed question of law and fact." *State v. Tourville*, 2016 WI 17, ¶16, 367 Wis. 2d 285, 876 N.W.2d 735. We uphold the circuit court's factual findings "'concerning circumstances of the case and counsel's conduct and strategy'" unless those findings are clearly erroneous. *State v. Silva*, 2003 WI App 191, ¶16, 266 Wis. 2d 906, 670 N.W.2d 385 (quoted source omitted). Whether counsel's performance was deficient and prejudicial are both questions of law that we review de novo. *State v. Pitsch*, 124 Wis. 2d 628, 634, 369 N.W.2d 711 (1985).

### A. Failure to Cross-Examine Davis

¶26 Thompson argues that trial counsel was ineffective by failing to cross-examine Davis to reveal the details of the plea agreement he reached with the State on the second day of Thompson's trial. It is undisputed that the State had originally charged Davis with two counts—attempted first-degree intentional homicide and first-degree recklessly endangering safety. However, pursuant to the plea agreement, the State reduced the first count to first-degree reckless injury and dismissed the second count, and the State agreed to cap its sentencing recommendation at eight years of initial confinement. The sentencing recommendation cap was contingent upon Davis providing truthful testimony in Thompson's case.

¶27 There is no question that evidence about Davis's plea deal would have been admissible. Thompson argues that there was no strategic reason for not asking Davis about the favorable terms of his deal, and that it was deficient not to

12

do so. Thompson contends that Davis was the most credible of the three co-defendants, and that the failure to cross-examine Davis prejudiced Thompson's defense.

¶28    We begin by addressing deficient performance. During the *Machner* hearing, trial counsel explained that he viewed the co-defendants' testimony as his "biggest problem" to overcome at trial. Counsel's strategy was to attack the co-defendants' credibility, and to show that each had a motive to minimize his own responsibility for the shooting and curry favor with the State. However, counsel explained that the "No. 1 rule of cross-examination" is that you should not "ask a question unless you know the answer." Counsel stated that he had "violated that rule over [his] years of practice enough times to know it's got its reasons for being the No. 1 rule." Counsel further explained that Davis had been a surprise witness, that counsel "didn't know what [Davis] was going to say," and that Davis "could have done more damage than I could have sought to avoid with lucky answers."

¶29    The circuit court found that "[t]rial counsel made this decision [not to cross-examine] Davis without knowing how Davis would answer any questions, as well as knowing what the other co-defendants were going to say (or had said to the investigators)." Therefore, the court found, counsel had a strategic reason for declining to cross-examine Davis.

¶30    Although the circuit court described a sound strategic reason for trial counsel's decision to not cross-examine Davis about his account of the shooting, that rationale does not explain counsel's failure to ask more targeted questions about the terms of Davis's plea agreement with the State. During the *Machner* hearing, counsel did not dispute that he had received the terms of Davis's plea

13

agreement prior to Davis's trial testimony. Counsel acknowledged that he was entitled to information about Davis's plea in discovery, and that if he did not know the terms, he could have asked the prosecutor and the terms would have been provided.[7]

¶31 We nevertheless conclude that trial counsel's performance was not deficient for the following three reasons. First, Davis provided the most vague and least incriminating testimony of the three co-defendants. Greer (through his recorded interviews and subsequent trial testimony) and Sostre (through his trial testimony) provided a substantial amount of incriminating testimony against Thompson. Indeed, the circuit court judge, who sat through the trial, said that Greer's initial uncooperative testimony, his tearful video-recorded confession, and his subsequent change in demeanor on the witness stand "was especially compelling at trial." By contrast, the account that Davis provided was quite limited—in fact, at no point did Davis state anything about a gun or identify Thompson as the shooter. As such, we conclude that Davis's testimony was only of marginal value to the State, in comparison with the testimony provided by Thompson's other co-defendants.

¶32 Second, under the specific circumstances here, we agree with counsel's assessment that cross-examining Davis about the concessions he received in exchange for his plea "could have done more damage than [counsel]

---

[7] The trial transcript suggests that counsel mistakenly thought that Davis had not been asked about entering a plea on direct examination. During the last day of trial when the prosecutor mentioned Davis's plea agreement during closing, counsel objected and informed the circuit court that he did not recall Davis testifying that he entered a plea to a specific charge in this case. Counsel stated: "[Davis's plea] didn't come in as far as I could tell and then … [Davis didn't say anything] about guns, comments about a plan, that is why I didn't cross."

could have sought to avoid with lucky answers." For example, as counsel explained during the *Machner* hearing, he believed that it "would have caused more harm than good" if the jury learned that Davis felt that his conduct on the night of the shooting was "worth eight years' initial confinement." Additionally, the State would have been able to rehabilitate any harm done to Davis's credibility by eliciting the fact that the sentencing concessions he received were contingent upon Davis providing truthful testimony at trial. Therefore, there was a risk that any benefit of cross-examining Davis about concessions he received from the State would have been overshadowed by other testimony on this topic, which could have bolstered his credibility.

¶33 Finally, trial counsel found a less risky way to attack Davis's credibility by suggesting that Davis falsely implicated Thompson in an effort to further his own self-interest. We agree with the circuit court that "[t]rial counsel presented an attack on Davis as proficiently as his attack on Greer and Sostre." In his closing argument, trial counsel discussed at length the trial evidence suggesting that Sostre's and Greer's accounts were motivated by self-interest, and explicitly linked Davis's trial testimony to the same self-serving motivations. Specifically, counsel argued:

> What do you have? You've got these three guys and, you know, you have an instruction on how to evaluate their credibility, which you're capable of doing already. …. Whether the witness has an interest or lack of interest in the result of this trial. Do you think Davis, Greer and Sostre have no interest in this matter? Here they are, two of them are still—well, let me just do it individual-by-individual. Greer is still pending for trial with a plea of not guilty, not just as a co-defendant in this case, but some other gun case.…
>
> Mr. Davis, you know, you know, did he admit to any wrongdoing [during his trial testimony]? No. He pled apparently—he's got 11 priors and he pled guilty, including

15

the one to that day. And you listen to him testify. What did he plead guilty to? Why would he plead guilty to anything from this day if all he did was being in a car and drive it and not see a gun, not hear a gun, hear it pop but, you know, he did [not] see a guy come back with a gun. He didn't hear any discussion ahead of time someone is going to be shot. He didn't see any business about a gun afterwards or getting rid of a gun. If you listen to his testimony describing what he did in that car on that date, why would he have pled guilty to anything? I mean, he's like Greer, trying to exonerate himself, make himself look good in front of Judge Hyland and in front of the detective and in front of the prosecutors, and of course he would do that. That's self-interest.

And Mr. Sostre, the fourth defendant in this case who isn't pending for trial because his charges were dropped right away, could still be filed again, but what did he admit to on the stand in terms of his own wrongdoing? It was the same thing, wasn't it? He was just trying to blame everything on Darrick Thompson and give the State of Wisconsin whatever they wanted in order to please them, in order to look good for them, in order to look good to this judge, although his case wouldn't be in this court. Mr. Sostre could be in a lot of trouble.

¶34 Therefore, contrary to Thompson's argument, the transcript shows that trial counsel attacked Davis's credibility and portrayed his testimony as self-serving through counsel's closing arguments. As the circuit court explained, "[it] could not imagine how, if at all, [counsel's closing argument] could have been improved by the ability to specify that Davis plead to a specific lesser charge or had a sentencing cap of [eight] years made available to him." As a result, we disagree that counsel allowed the jury to believe that Davis had taken full responsibility for his role in the events without receiving any benefit.

¶35 For these reasons, we conclude that Thompson fails to show that trial counsel's omission was "outside the range of professionally competent assistance" or that counsel's performance "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 690, 688. This conclusion defeats his

16

ineffective assistance of counsel claim on this issue. *See id.* at 697 (providing that we need not address both deficiency and prejudice if the defendant fails to make a sufficient showing on either one).

### B.  Failure to Counter Parr's Testimony with an Expert

¶36    We now turn to Thompson's argument about Parr's testimony, which attempted to link the "footprint impression" at the crime scene to Thompson's shoe size.  Thompson argues that William Bodziak's testimony during the *Machner* hearing shows that Parr's shoe size estimate was based on unreliable junk science.  He contends that counsel should have retained a footprint impression expert like Bodziak, who could have assisted counsel in excluding Parr's estimate altogether or, alternatively, could have aided counsel in his efforts to attack Parr's credibility and opinions at trial.

¶37    We begin by providing additional background about Parr's pretrial report, his testimony at trial, how the prosecution used his testimony during closing arguments, and Bodziak's testimony at the *Machner* hearing.

¶38    Parr produced a report that was provided to trial counsel in pretrial discovery.  In this report, Parr outlined his training and experience cataloging footwear evidence and making footwear comparisons.  He stated that he had been unable to find any "discernable outsole design" in the impressions at the scene because the impressions were "filling up with recent snowfall," which obscured any tread pattern.  However, Parr measured the impression that the shooter's foot made at the top of the snow, which provided an "overall length" of 320 millimeters.  Based on that measurement, he estimated the shoe size to be between a US men's size 11 and 13.  The report also states that the boots Thompson had

17

been wearing when he was arrested were size 11.5 and 320 millimeters in length, and were the "same overall length as the impressions found at the scene."

¶39    Trial counsel filed a pretrial motion in limine regarding expert testimony.  Although counsel did not specifically discuss Parr's report, counsel requested an order preventing the State from attempting "to present 'expert' testimony by police officers or others" without first establishing the witness's qualifications and the reliability of the witness's opinions.  The circuit court granted the motion in limine.

¶40    Parr testified at trial as follows.  He arrived at the scene about thirty minutes after the shooting and, among other things, he investigated and photographed a trail of footprints in the snow that officers believed were linked to the shooter.  Parr placed an emergency blanket across the top of one of these impressions in an attempt "to save whatever evidence we could with the footwear impression."

¶41    At that point, trial counsel asked for a sidebar.  Counsel predicted that the State would attempt to present Parr as an "expert witness [to] provide opinions on certain things."  He explained that the State had not designated Parr as an expert witness, and he asked the circuit court to preclude Parr from "giving [expert] opinions about the height of the suspect and about the shoe size of the suspect."  In response, the prosecutor asserted that Parr would testify regarding the "facts of the case" without "making an expert opinion."  The prosecutor indicated that Parr "will testify only to those measurements that he made and what that corresponds to regarding shoe size and length of gait.  That will not lead to any evidence by this officer regarding height …."  Trial counsel objected to Parr presenting any testimony about shoe size, but the court found that Parr was able to

offer limited testimony on that topic if he could "lay a foundation for the resource that he's using as far as an accepted reference for shoe manufacturers [and] shoe sizes …." The court explained: "A shoe size, I can see that being within the parameters of his training and experience and his detection and investigation of crime scenes," but Parr would not be allowed to "give[] expert opinion about how this print matches a certain shoe."

¶42 The State continued its direct examination, and Parr testified as follows. He was trained in identifying footwear treads and determining the overall length and size of a footprint. "The tread ware is kind of like a fingerprint" because each shoe has imperfections, but Parr was unable to determine anything about the tread ware of the footprints in question due to the heavy snow and wind that night. The only thing that Parr was able to determine was "an overall length of the apparent suspect footwear itself," which he measured by placing an L-shaped measuring tool at the top of the snow. Using this method, Parr determined that the impression "was 320 millimeters in overall length," and the prosecutor showed the jury a grainy and indistinct photograph that Parr took of this measurement.

¶43 The State then asked how that measurement would correspond to shoe sizes. Trial counsel objected on the grounds of lack of foundation. Parr provided some of his training and research, and then stated that it was "a rough approximation … in terms of you can't go half sizes and stuff of that nature." He also explained that some shoes and boots run smaller or larger, and again emphasized that "it's a rough approximation.… It's not a given science as to what you're looking at." Counsel again objected to Parr's testimony about shoe size, but the circuit court overruled counsel's objections, stating that Parr "has testified to a source of information, and in the end a determination based on size and

accepted reference points as to size of shoes and boots." The court then emphasized that "it is all an approximation, which counsel can delve into on cross-examination." Parr then testified that 320 millimeters length corresponded with a size 11 to 13 shoe.

¶44 Parr then moved on to his measurement of the distance between footprints to determine the shooter's running gait. Parr measured the gait as 50-55 inches. The prosecutor asked: "[A]re you able to say anything about this individual based on his gait?" Parr testified: "The only thing I could say for certain, …. I'm 6 [foot] 3 [inches] tall, and my running gait is approximately 55 inches. So I found this, and I later found another gait distance which was around 55 inches, which led me to believe the suspect was around six foot tall."[8] Trial counsel immediately objected and moved to strike this testimony. The circuit court determined that Parr's testimony had "gone too far," and it struck the testimony and instructed the jury to disregard it.[9]

¶45 On cross-examination, trial counsel returned to the topic of the quality of the footwear impressions. He asked: "I think you already testified on direct examination that the quality of these impressions was far too poor for you to

_____

[8] Parr had not been present during the sidebar when the prosecutor indicated that Parr would not be offering an opinion about the suspect's height, and apparently, no one instructed Parr that he should not offer testimony on that topic. We note that the criminal complaint states that Sostre and Davis are each 5 foot 7 inches tall, Greer is 6 foot tall, and Thompson is 6 foot 2 inches tall.

[9] During the postconviction proceedings, neither party challenged the circuit court's determination to sustain the objection, strike the testimony, and instruct the jury to disregard it. On a related note, we observe that, the following day of trial, the jury heard another police officer estimate the height of the shooter, which the court also told the jury to disregard. Although Thompson challenged the adequacy of the instruction in the postconviction proceedings before the circuit court, he does not develop an argument to that effect on appeal.

be able to make any comparisons with a standard, a shoe sample; is that right?" Parr replied, "Yes, sir."

¶46    During closing arguments, the State referred to Parr's length and shoe size testimony. The prosecutor argued:

> You heard from Investigator Parr that he actually tried to preserve one of those prints. You heard that he has experience looking at treads, but that the weather conditions weren't such that he could do that.
>
> You heard that he did give an estimate as to shoe size for a print that he believed to be the suspect that matched up with that track across the building that matched up with the video of the person running pas[t] in the video that you see and that that shoe was between a Size 11 and a Size 13. He told you he couldn't get half sizes, he couldn't do that, but he could say 11 to 13. And then you heard from the boots that Mr. Thompson was found in, that they were size eleven-and-a-half.

The State again returned to Parr's shoe size testimony during its rebuttal. The prosecutor argued that Thompson's clothing was important "because of the shoe size, eleven-and-a-half, matching the shoe size between 11 and 13 of the physical evidence found at the scene." He argued that, although trial counsel had attempted to portray the prosecution as "hanging our hats on just the three individuals, Mr. Greer, Mr. Davis and Mr. Sostre[,] [t]hat's why we have physical evidence so that we can corroborate statements made by eye witnesses."

¶47    As mentioned above, Thompson filed a postconviction motion arguing that trial counsel should have retained an expert like William Bodziak to attack Parr's length and shoe size testimony. According to Bodziak, it was not possible to determine whether the footwear impression Parr measured accurately

21

represented the actual dimensions of the shoe that made the footprint due to the weather conditions that night.[10] Bodziak was asked whether a certified forensic footwear examiner could "draw any valid or reliable conclusions about the person creating a footwear impression from the measurements that Investigator Parr made," and Bodziak responded, "No. And I will add that in over 45 years of making these comparisons, I'm not aware of a single case where conclusions were reached and accepted in court by a certified footwear examiner."

¶48    Thompson argues that, with assistance from an expert like Bodziak, trial counsel could have proven that Parr's length and shoe size testimony was wholly unreliable. It is true that Bodziak's testimony and report demonstrated significant problems with Parr's testimony on this point, and we are troubled by the suggestion in the State's closing argument that Parr "match[ed]" the impression to Thompson's shoe size, which "corroborat[ed]" the co-defendants' testimony. Nevertheless, for reasons we now explain, we conclude that Thompson has not met his heavy burden to show that trial counsel's failure to retain an expert constituted deficient performance or prejudiced his defense.

---

[10] Bodziak opined that Parr's conclusion about the suspect's shoe size was unreliable for multiple reasons. First, walking or running in snow does not leave an accurate impression of shoe size because the heel breaks the snow before hitting the ground and the toe drags some of the snow away. Accordingly, the size of a footwear impression in the snow may be "a lot different than the total heel-to-toe measurement of the shoe that made it." Second, Parr's method of measuring was inaccurate, based both upon the placement of the measure (according to Bodziak, a person would need to excavate the impression and place the measure at the same plane rather than on the top of the snow) and the absence of any outer tread marks from which to gauge the size of the impression. Third, there is not real standardization among shoe sizes, and the physical impression of an outsole varies significantly with the brand and style of footwear. According to Bodziak, the only way to "accurately and reliably" determine the shoe size of an impression is first to determine the footwear's brand name through tread patterns and then compare it to manufacturer's samples.

¶49    We begin with deficiency.  An attorney's performance may be deficient if the attorney could have prevented the admission of evidence by making a timely objection but failed to do so.  *State v. Domke*, 2011 WI 95, ¶46, 337 Wis. 2d 268, 805 N.W.2d 364.  However, an attorney's failure to make an objection that would have been properly overruled by the court is not deficient performance.  *State v. Berggren*, 2009 WI App 82, ¶21, 320 Wis. 2d 209, 769 N.W.2d 110.  Here, the circuit court found that, had trial counsel offered Bodziak's testimony in an attempt to exclude Parr's measurements and shoe size comparison altogether, the court "would likely have held that the difference in method goes to weight, and that placing a ruler next to an impression provides evidence that can be challenged as to weight, but not rendered inadmissible." Circuit courts have wide latitude with regard to evidentiary decisions, and we cannot say that the court's post-trial determination about admissibility was clearly erroneous.

¶50    Therefore, the best trial counsel could have hoped to do with expert assistance is to further undermine Parr's conclusions.  Yet, counsel significantly undermined Parr's conclusions without the assistance of an expert—he objected to Parr's testimony, which drew out Parr's admissions that the impression was of "far too poor" quality to make a comparison, that his method was "not a given science," and that his conclusion about shoe size was "a rough approximation." Additionally, once Parr's testimony veered into inadmissible opinion regarding the suspect's height, counsel immediately objected and moved to strike that testimony.

This led to a favorable result by the circuit court, and the jury was instructed accordingly.[11]

¶51    Thompson relies on a single quote from ***Thiel***, which states that "'counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" ***Thiel***, 264 Wis. 2d 571, ¶40 (emphasis omitted) (quoted source omitted). We take no issue with this proposition, and we agree that, under certain circumstances, an attorney's failure to retain an expert to evaluate the methods and credibility of an opposing witness may constitute deficient performance. At the same time, however, whether to retain an expert and present expert witness testimony are generally considered to be discretionary decisions to be made by trial counsel. *See **State v. Wood***, 2010 WI 17, ¶¶71-74, 323 Wis. 2d 321, 780 N.W.2d 63; *see also **State v. Wright***, 2003 WI App 252, ¶35, 268 Wis. 2d 694, 673 N.W.2d 386 (counsel not deficient for failing to call eyewitness identification expert and instead directly challenging the credibility of the witnesses).

¶52    As demonstrated above, this is not a case in which counsel passively sat back and did nothing to anticipate and counter Parr's testimony. With the benefit of hindsight, it is easy to say that it would have been better for counsel to have obtained a defense expert to *further* attack and counter Parr. However, defendants are not entitled to perfect representation, ***Thiel***, 264 Wis. 2d 571, ¶19, and it is not our role to reconstruct the "ideal defense" on appeal, ***State v. Harper***,

---

[11] We presume that a jury properly follows the instructions given by the court. ***State v. Pitsch***, 124 Wis. 2d 628, 645 n.8, 369 N.W.2d 711 (1985). As a result, to any extent that Thompson is basing his ineffective assistance of counsel claim on the proposition that counsel was deficient, in part, for failing to use an expert to preclude Parr's testimony about the shooter's height, we reject it. That testimony was properly stricken by the circuit court.

57 Wis. 2d 543, 556-57, 205 N.W.2d 1 (1973). Here, we cannot conclude that trial counsel's attack on Parr's credibility and conclusions without the assistance of an expert was "outside the range of professionally competent assistance" or that his performance "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 690, 688. Therefore, we agree with the circuit court that Thompson has not met his burden to show that his counsel's performance was deficient.

¶53    We now briefly address prejudice and explain our conclusion that Thompson has likewise not met his heavy burden to show that the failure to retain an expert prejudiced the defense. Thompson argues that the State used Parr's length and shoe size testimony to "corroborate problematic testimony" from Thompson's co-defendants, and that there is a reasonable probability that the jury would have acquitted Thompson without that corroboration. Despite the State's questionable reliance on the shoe size comparison in closing arguments, we are persuaded that the jury could not have put too much stock in Parr's length and shoe size comparison testimony. Consistent with Parr's admission that the footprint impression was of "very poor" quality, the photograph shown to the jury confirms that the so-called footprint impression was filled with snow and barely discernable. Under the circumstances, it is not reasonably probable that the jury placed any significant weight on Parr's testimony in determining guilt beyond a reasonable doubt. Therefore, we conclude that there is not a reasonable probability of a different result, even if trial counsel had successfully challenged

the admission of Parr's length and shoe size testimony or presented the testimony of an expert like Bodziak to further undermine it.[12] *Strickland*, 466 U.S. at 694.

¶54    For all of these reasons, we reject Thompson's claims of ineffective assistance of counsel.[13]

## II.  Alternative Arguments

¶55    Before concluding, we briefly address and reject two alternative arguments that Thompson advances on appeal.

¶56    First, Thompson argues that, to the extent that trial counsel was not ineffective for failing to retain a footwear impression expert, Bodziak's testimony is newly discovered evidence and entitles him to a new trial.  *See State v. Love,* 2005 WI 116, ¶¶43-44, 284 Wis. 2d 111, 700 N.W.2d 62 (to be entitled to a new trial, a defendant must prove that newly discovered evidence is new, material, not

---

[12] The State presents an alternative counterargument, which we reject, to Thompson's ineffective assistance of counsel claim.  As the State explains, Thompson was charged as party to a crime under WIS. STAT. § 939.05 and, therefore, the State did not have to prove that Thompson was the shooter that evening.  Accordingly, the State argues, "it doesn't matter if Parr's testimony suggested that the shooter wore the same size shoe as Thompson because Thompson was tried and convicted as [party to a crime]" and "the State didn't have to prove that Thompson was the shooter."  We reject this argument because it disregards how this case was presented to the jury.  As Thompson explains in his reply brief, the State took pains to argue that the footprint that belonged to the shooter was consistent with Thompson, and there was scant evidence that Thompson participated in the crime in any role other than the shooter.  To the extent the State is merely observing that a jury *could have* convicted Thompson without finding that he was the shooter, the State is correct—but that hardly means that there would have been no purpose or value in challenging trial evidence suggesting that Thompson might have been the shooter that night.

[13] Thompson also argues that he was prejudiced by the cumulative effect of his trial counsel's alleged errors.  Because we have concluded that counsel's performance was not deficient, that ends our inquiry.  *See State v. Thiel*, 2003 WI 111, ¶61, 264 Wis. 2d 571, 665 N.W.2d 305 ("each act or omission must fall below an objective standard of reasonableness in order to be included in the calculus for prejudice").

cumulative, and that the defendant was not negligent in seeking the evidence, and further, a reasonable probability that a different result would be reached in a trial if a jury was presented with the new evidence along with the trial evidence). For reasons similar to those stated above in ¶53, we conclude that there is no reasonable probability of a different result had the jury been presented with Bodziak's testimony. As a result, we reject Thompson's newly discovered evidence claim.

¶57 Second, Thompson asks us to order a new trial in the interest of justice pursuant to WIS. STAT. § 752.35. He argues that, regardless of whether trial counsel was constitutionally ineffective, counsel's omissions resulted in the real controversy not being tried. We disagree and decline to use our discretionary authority to order a new trial under the circumstances.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.